IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TRUSTEES OF THE UNIVERSITY          :          CIVIL ACTION
OF PENNSYLVANIA                      :
                                    :
        v.                          :
                                    :
ST. JUDE CHILDREN'S RESEARCH        :          NO. 12-4122
HOSPITAL                            :

MEMORANDUM

Dalzell, J.                                         April 12, 2013

## I.  **Introduction**

We consider here a motion by St. Jude Children's Research Hospital ("St. Jude") to dismiss Count I of the complaint filed by the Trustees of the University of Pennsylvania ("Penn" or "the University"), a Count which alleges tortious interference with contractual relations.[1]  St. Jude argues first that the claim is barred by the Noerr-Pennington doctrine, and that, if it is not, the University has failed to state a claim on which relief can be granted.

---

[1] Also pending before the Court is St. Jude's motion to dismiss Count I of the counterclaim the University filed in response to the Tennessee action, now consolidated here.  In a December 14, 2012 epistolary submission to the Court, St. Jude asks us to consider the motions to dismiss together because they are "essentially identical."  We will do so, and our analysis here will apply to St. Jude's motion to dismiss the University's counterclaim as well.

a.  **Factual History**

This action between the University and St. Jude concerns two Materials Transfer Agreements ("MTAs" or "Agreements") between the parties, one executed in 2003 and the other in 2007.

The Agreements arose out of research that doctors at each institution had been conducting on immunotherapy cancer treatment.  The University avers that Carl H. June, M.D., a Professor of Pathology and Laboratory Medicine at Penn, had developed a "CD19 ScFv DNA lentiviral construct" (the "June Construct") that "causes T cells to express chimeric antigen receptors (CARs) in patients such that their cancer is treated". Am. Comp. ¶ 8.

According to the University's amended complaint, Dario Campana, M.D., Ph.D., a doctor at St. Jude[2], had also developed "an anti-CD19 BB-ζ chimeric receptor construct" (the "Campana Construct").  Id. at ¶ 11.  St. Jude claims that this construct is a molecule that "can be expressed on the surface of a normal human immune T-cell, and . . . causes the T-cell to recognize and attack certain leukemic cancer cells".  MTD at 3.  Dr. June

---

[2] The University alleges that Dr. Campana no longer works at St. Jude and currently serves as a professor at the National University of Singapore, Department of Pediatrics.  Am. Comp. ¶ 14.

and Dr. Campana met at a conference in 2003, after which Dr. June asked Dr. Campana to provide him with a sample of the Campana Construct.  Am. Comp. ¶ 12.

In order to facilitate this exchange, the parties entered into the first MTA at issue here on December 17, 2003. Id. at ¶ 13.  That Agreement defined the "Material" St. Jude was transferring as "the anti-CD19-BB-ζ chimeric T-cell receptor construct, including any progeny, portions, unmodified derivatives and any accompanying know-how or data".  2003 MTA at ¶ 1, Am. Comp. Ex. D.  The Agreement provided that "the Material will only be used to create a lentiviral chimeric T-cell receptor construct to be used in pre-clinical studies", id. at ¶ 3, and "may not be used in humans" or "for any commercial purpose."  Id. at ¶ 4.  It further provided that the University would "not commercialize any product that contains Material without the prior written approval of St. Jude."  Id. at ¶ 8.

By 2007, Dr. June wished to use the June Construct to conduct human clinical trials, Am. Comp. ¶ 17, and so in February 2008, the parties executed a second MTA, dated October 2, 2007[3], allowing the product to be used in such clinical trials.  2007 MTA at ¶ 3, Am. Comp. Ex. E.  That agreement

---

[3] We refer to this agreement, as the parties do, as the 2007 agreement.

contained the same definition of "Material" as found in the 2003 agreement.  Id. at ¶ 1.

In August 2011, Dr. June described the results of his study in an article in The New England Journal of Medicine, New Eng. J. Med. 8:725-733 (2011) and in Science Translational Medicine, 2011; 3(95):95ra73.  Id. ¶ 23.  St. Jude, in a complaint we will discuss below, avers that the University did not submit the Science Translational Medicine article to it for approval and that Penn and Dr. June failed to acknowledge that the Material the article referred to had come from St. Jude. St. Jude Comp. ¶ 49.

In a November 22, 2011 letter, the University informed St. Jude that it wished to terminate the MTA[4].  Am. Comp. Ex. F.

The University contends that it "contractually agreed to exclusively negotiate with Novartis regarding a ground-breaking collaboration that would develop Dr. June's cellular immunotherapy for general cancer patient use."  Id. ¶ 27. According to the amended complaint, "The University . . . actively negotiated with Novartis a collaboration under which the University would receive funding that would allow it to

_____

[4] In its amended complaint, the University says this letter informed St. Jude it wished to terminate the 2003 MTA, but the letter refers to the 2007 MTA in its subject line and does not make clear which MTA the University seeks to terminate.  The distinction does not affect our decision here.

continue with clinical trials of the Penn Immunotherapy without undue delay", and "[a]s of July 10, 2012, the University and Novartis had made substantial progress towards reaching an agreement that would allow continued development of the Penn Immunotherapy Technology." Id. ¶¶ 28-29.

According to the University's complaint, "[s]tarting in August 2011, St. Jude and the University had ongoing discussions regarding St. Jude's contention that the University allegedly breached the 2003 and 2007 MTAs." Id. ¶ 30. St. Jude claims that by January of 2012 it "had learned that the University had breached both the 2003 MTA and the 2007 MTA by publishing experimental results without the required acknowledgment of St. Jude and without sharing the proposed publication with St. Jude beforehand", and by "engaging in prohibited commercialization efforts", MTD at 5.

As a result, St. Jude's General Counsel, Clinton Hermes, and outside counsel, Glenn Krinsky, spoke to University General Counsel Wendy White by telephone on January 20, 2012. Id. While they were speaking, Krinsky sent White an e-mail, explaining:

> Mr. Hermes and I telephoned you several
> minutes ago to inform you that St. Jude
> intended to file suit today against the
> Trustees of the University of Pennsylvania
> ("Penn") in connection with disputes arising

under that certain Collaboration and
Materials Transfer Agreement . . . As an
alternative to filing suit, Mr. Hermes
offered Penn the opportunity to enter into a
"Stand Still Agreement" with St. Jude to
enable the parties to discuss the disputes
arising under the MTAs with the hopes of
resolving those disputes and obviating the
need for a lawsuit . . . In exchange . . .
you have agreed on behalf of Penn that Penn
will not file a lawsuit or initiate any
other type of judicial or administrative
proceeding . . . until no earlier than
Friday February 3rd, 2012.  On behalf of
Penn, you explicitly acknowledge that there
are no restrictions on St. Jude's ability to
initiate legal proceedings related to the
MTAs including, but not limited to, a
federal court lawsuit against Penn in the
Western District of Tennessee at any time
after 3:00pm EST on Tuesday January 31, 2012
in the event that Penn has not executed a
Stand Still Agreement . . .

Id. at 5-6.  According to St. Jude, White responded that she

"Understood and confirmed" the terms of the e-mail, and when the

deadline for settlement passed, the parties had not reached an

agreement.  Id. at 6.

### b.  **Procedural History**

On July 11, 2012, St. Jude filed a breach of contract

action against the University in the Western District of

Tennessee.  See St. Jude Comp., MTD Ex. A-1.  St. Jude sought

eight forms of preliminary and permanent injunctive relief: (1)

specific performance of the 2003 and 2007 MTAs and to instruct

the University to make submissions to journals crediting Dr.
Campana and St. Jude's with the use of chimeric antigen
receptors ("CAR"), St. Jude Comp. at ¶ 85 (1)-(4), and (2) an
order that (a) the University enter into a Joint Materials
Transfer Agreement covering the distribution of materials that
contain the CAR, (b) the University not enter into an agreement
to commercialize any product containing the CAR without St.
Jude's approval, and (c) directs the University to provide St.
Jude with a list of everyone to whom it had distributed the CAR
or CAR coding sequence and a copy of all patent applications for
inventions containing the CAR or the CAR coding sequence.  Id.
at ¶ 85 (5)-(8).  Finally, St. Jude sought actual, compensatory,
and punitive damages, as well as the imposition of a
constructive trust or lien on "the Materials, and any construct,
progeny, portions, replications or derivatives of the
Materials".  Id. at ¶ 85 (9)-(10).

On August 2, 2012, the University moved to dismiss the
Tennessee action for lack of personal jurisdiction, or, in the
alternative, to transfer the action to this District.  See Penn
MTD, St. Jude MTD Ex. C-1.

Meanwhile, in July of 2012, the University filed a
complaint in this Court, which it amended in September of that
year.  In its amended complaint, the University alleges tortious

interference with prospective contractual relations and seeks a declaratory judgment stating that it has not materially breached the 2003 and 2007 agreements and that the 2003 agreement has been terminated.

St. Jude moved to dismiss the entire action without prejudice on the ground that the Tennessee action was pending and asserted that the University's claims were compulsory counterclaims in that action.  St. Jude alternatively moved this Court to dismiss Count I of the University's complaint which alleged tortious interference with prospective contractual relations for failure to state a claim on which relief can be granted, arguing first that Noerr-Pennington barred the claim, and also that the University had failed to allege sufficient facts to support its claim, see Def. MTD at 1, 16, 24.

On October 10, 2012, the United States District Court for the Western District of Tennessee transferred its case to this Court pursuant to 28 U.S.C. § 1404(a).  We soon after consolidated the actions.

As St. Jude acknowledges, "[t]he transfer moots the first part of St. Jude's Motion to Dismiss or Stay, which seeks dismissal or stay of this action pursuant to the first filed and compulsory counterclaim rules".  St. Jude Reply at 1.  We thus

consider the second part of St. Jude's motion, by which it aims to dismiss Count I of the amended complaint.

## II.  <u>Analysis</u>

The gravamen of the University's complaint is that "St. Jude first asserted an interest in the June Construct in 2011, but delayed litigation until the middle of 2012, when the University and Novartis were actively involved in negotiation of a major collaboration agreement."  Am. Comp. ¶ 37.  The University further argues that St. Jude knew it was not entitled to the relief it sought, including the injunctive relief, <u>id.</u> at ¶ 43, and instead, "St. Jude filed the Tennessee Complaint with the intent that the public disclosure of its baseless allegations and requests for injunctive relief therein would disrupt the negotiations between the University and Novartis." <u>Id.</u> at ¶ 47.

St. Jude responds that this claim is barred by the <u>Noerr-Pennington</u> doctrine, and, in the alternative, that the University's amended complaint fails to state a claim for tortious interference with contractual relations on which relief can be granted.  MTD at 16, 24.

a. **Choice of Law**

The parties dispute whether Tennessee law or Pennsylvania law governs the University's tort claim.  As a federal court sitting in diversity, we are to apply the choice of law rules of our forum state, Pennsylvania.  <u>Lacey v. Cessna Aircraft Co.</u>, 932 F.2d 170, 187 (3d Cir. 1991) (citing <u>Klaxon Co. v. Stentor Electric Mfg. Co.</u>, 313 U.S. 487 (1941)).

Under Pennsylvania's choice of law scheme, we must first determine whether a true conflict exists between the laws of the two states.[5]  If it does, we consider "the governmental

---

[5] With regard to whose substantive law Pennsylvania's choice of law rules would direct us to use, St. Jude contends that where a party alleges the tortious filing of a lawsuit "Pennsylvania courts have generally applied the law of the state in which the allegedly wrongful litigation was filed."  MTD at 24.  (citing, <u>inter alia</u>, <u>Rosen v. Tesoro Petroleum Corp.</u>, 582 A.2d 27, 31 (Pa. Super. Ct. 1990)).

The University argues that the Pennsylvania conflicts-of-law analysis focuses on which state has the greater interest in the application of its law, <u>see</u> Univ. Resp. at 23 n.5 (citing <u>Toledo Mack Sales & Serv. v. Mack Trucks, Inc.</u>, No. Civ. 02-CV-4373, 2005 WL 724117, at *11 (E.D. Pa. Mar. 29, 2005)), and that Pennsylvania courts considering tortious interference claims "have routinely found that the state with the greatest interest in application of its law is <u>the state where the business relationship at issue transpires</u>."  <u>Id.</u> (emphasis in original) (citing <u>KDH Electronic Systems, Inc. v. Curtis Tech. Ltd.</u>, 826 F. Supp. 2d 782, 801 (E.D. Pa. 2011)).  The University concludes that "[n]o part of the business relationship involves Tennessee" and so "Pennsylvania has the greatest interest in application of its laws under Pennsylvania conflicts of law principles."  <u>Id.</u>

As we discuss, there is no true conflict between Tennessee and Pennsylvania law on tortious interference with contractual relations.

interests underlying the issue and determine which state has the greater interest in the application of its law." Rosen v. Tesoro Petroleum Corp., 399 Pa. Super. 226, 231 (Pa. Super. Ct. 1990) (citing Cipolla v. Shaposka, 439 Pa. 563 (1970)).

Trau-Med of America, Inc. v. Allstate Ins. Co., 71 S.W.3d 691 (Tenn. 2002) set forth the elements of the tort of intentional interference with business relationships in Tennessee.  In order to state such a claim, a plaintiff in Tennessee must show:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally (5) damages resulting from the tortious interference.

Id. at 701 (emphasis in original) (internal quotations and citations omitted).

The Tennessee Supreme Court observed that Tennessee courts had long recognized that "a defendant's malicious conduct preventing a third person from conducting business with the plaintiff was tortious and therefore actionable", id. at 698,

but it expressed concern that "because this tort extends beyond situations in which there exists a valid contractual relationship, it could potentially infringe upon the principle of free competition by holding liable those individuals engaged in legitimate business practices." Id. at 699.  In order to address this concern, the court limited liability to "improper conduct extending beyond the bounds of doing business in a freely competitive economy."  Id. at 700 (emphasis in original).

Pennsylvania law also recognizes a tort for intentional interference with prospective contractual relations whose elements are: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 208 (Pa. 1979) (citing Glenn v. Point Park College, 441 Pa. 474 (1971)).  See also Kernaghan v. BCI Communications, 802 F. Supp. 2d 590, 596 (E.D. Pa. 2011) (reciting the same elements).

The elements of the tort under Pennsylvania law are similar to those under Tennessee law: the first and second elements of the Pennsylvania formula track the first three elements of the Tennessee approach, and the damages prong in

both tests is much the same.  As to the fourth requirement of
the Tennessee formula -- that the defendant act with "improper
motive or improper means" -- the Tennessee Supreme Court
elaborated on this element by giving examples of improper means:
"those means that are illegal or independently tortious . . .
and those methods that violate an established standard of a
trade or profession, or otherwise involve unethical conduct."
Trau-Med, 71 S.W.3d at 701 n.5.  This prong is therefore cognate
with the third prong of the Pennsylvania test.

        The Pennsylvania Supreme Court in Glenn distinguished
actions taken without "privilege or justification" from those
"interferences which are sanctioned by the rules of the game
which society has adopted" and actions within "the area of
socially acceptable conduct which the law regards as
privileged".  Glenn, 441 Pa. at 482 (internal quotations
omitted).  Moreover, the policy underlying the two tests is
similar: as Glenn's reasoning shows, the goal of the
Pennsylvania scheme is to make actionable conduct that is
outside of the "rules of the game" while insulating those
engaged in legitimate business practices.

        There is thus no true conflict between Tennessee and
Pennsylvania law and we would not disserve Tennessee's interests
by applying Pennsylvania law to the University's tortious

interference claim.  Cf. Rosen, 399 Pa. Super. at 233 (finding a true conflict where "either state's interests would be disserved by the application of the other state's law").  We will thus apply Pennsylvania law.

### b.  Noerr-Pennington Applicability

St. Jude argues that the University's claim is barred by the Noerr-Pennington doctrine, which protects parties who petition governments for redress from claims arising in response to that petitioning.  See Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 122 (3d Cir. 1999) (citing Eastern R.R. Presidents Conference v. Noerr Motor Freight, 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657, (1965)).  In California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972), the Supreme Court extended Noerr-Pennington to include protection for citizens who petition for relief through the courts.  See also Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., 508 U.S. 49, 56-57 (1993) ("PRE").

To be sure, Noerr-Pennington immunity arose in the antitrust context, but as our Court of Appeals has explained it has "by analogy extended the Noerr-Pennington doctrine to offer protection to citizens' petitioning activities in contexts

outside the antitrust area as well." We, Inc. v. City of Philadelphia, 174 F.3d 322, 326-27 (3d Cir. 1999).

Noerr-Pennington does not, however, protect "sham" petitioning, that is, "petitioning activity 'ostensibly directed toward influencing governmental action [but that] is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." PRE, 508 U.S. at 56 (quoting Noerr, 365 U.S. at 144). Thus, Noerr-Pennington covers the conduct St. Jude engaged in here -- an issue the University disputes, as we discuss below -- and so we must determine whether that conduct was a "sham" precluding immunity.

## 1. Noerr-Pennington And The Right To Petition

The University first argues that Noerr-Pennington does not protect St. Jude because our Court of Appeals has limited the doctrine's application outside of the antitrust field to protecting the right to petition. Univ. Resp. at 19. In support, the University cites We, Inc., id., in which the court explained that "the purpose of Noerr-Pennington as applied in areas outside the antitrust field is the protection of the right to petition." Id. at 327. The University's argument assumes that this case does not implicate that right.

15

But courts for decades have held that the right to petition encompasses the right to bring a lawsuit.  As the Supreme Court explained over forty years ago in in California Motor Transport, "Certainly the right to petition extends to all departments of the Government.  The right of access to the courts is indeed but one aspect of the right of petition."  Id. at 510 (citing Johnson v. Avery, 393 U.S. 483, 485 (1969)).[6]  See also Cheminor Drugs, 168 F.3d at 122 ("[Noerr-Pennington] immunity extends to persons who petition all types of government entities - legislatures, administrative agencies, and courts"); Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 160 (3d Cir. 1988) (explaining that the right to petition protected by the Noerr-Pennington line includes the right to bring suit).  We thus do not find support in the caselaw for the

---

[6] Of late the breadth of this holding has not gone unquestioned. In Borough of Duryea v. Guarnieri, 131 S. Ct. 2488 (2011), Justices Scalia and Thomas expressed doubt in their concurring opinions that the Petition Clause encompasses lawsuits.  See id. at 2503 (Scalia, J., concurring) ("I find the proposition that a lawsuit is a constitutionally protected 'Petition' quite doubtful").  But as Justice Kennedy, writing for the seven-Justice majority in Guarnieri, explained, "[t]his Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."  Id. at 2494 (quoting, inter alia, Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 896-97 (1984), for the proposition that "the right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.").  We thus conclude that Guarnieri does not foreclose the application of Noerr-Pennington to petitions that take the form of lawsuits.

distinction the University seeks to draw between petitioning and bringing a lawsuit.  To the contrary, it remains black letter law that lawsuits constitute a form of protected petitioning under Noerr-Pennington.

The University next argues that its tortious interference claim is not only based on St. Jude's filing of the lawsuit, but also on "the fact that St. Jude made a baseless and unfounded demand for preliminary injunctive relief in the Tennessee Action that is unwarranted by the MTAs at issue, and it made this demand with the specific purpose of interfering with the Univer[s]ity's business relations."  Univ. Resp. at 22. The University contends that "St. Jude has come forward with no authority that supports that unfounded requests for injunctive relief, made with bad motive, are immunized under Noerr-Pennington."  Id.  St. Jude's request for injunctive relief was part of the lawsuit, so the University's argument -- that the allegedly "baseless and unfounded demand" is a separate activity not protected under Noerr-Pennington -- does not persuade. Instead, the University's contention bears on the determination of whether the suit was a sham so as not to warrant Noerr-Pennington protection, and we will consider it later during our analysis of that question below.

> ## 2.   Deciding <u>Noerr-Pennington</u>
> ## <u>Based On A Motion To Dismiss</u>

We next turn to the University's argument that "it would be inappropriate for this Court to dismiss the University's common law tort claim at the motion to dismiss phase based on St. Jude's assertion of an affirmative <u>Noerr-Pennington</u> defense."  Univ. Resp. at 20.

This contention appears to rest on two arguments. First, the University claims that because <u>Noerr-Pennington</u> is an affirmative defense it cannot form the basis for a Rule 12(b)(6) motion.  <u>Id.</u> at 20.  Next, the University suggests that whether <u>Noerr-Pennington</u> applies is a question of fact that cannot be decided at the motion to dismiss stage.  <u>Id.</u>  We address each argument in turn.

The University relies on <u>In re Adams Golf, Inc. Securities Litig.</u>, 381 F.3d 267 (3d Cir. 2004), for the proposition that "an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."  <u>Id.</u> at 277.  <u>Jones v. Bock</u>, 549 U.S. 199 (2007), makes clear that this principle is not unvarying -- an affirmative defense <u>may</u> form the basis for dismissal on a 12(b)(6) motion:

> A complaint is subject to dismissal for
> failure to state a claim if the allegations,
> taken as true, show the plaintiff is not
> entitled to relief.  If the allegations, for

> example, show that relief is barred by the
> applicable statute of limitations, the
> complaint is subject to dismissal for
> failure to state a claim; that does not make
> the statute of limitations any less an
> affirmative defense . . . Whether a
> particular ground for opposing a claim may
> be the basis for dismissal for failure to
> state a claim depends on whether the
> allegations in the complaint suffice to
> establish that ground, not on the nature of
> the ground in the abstract.

Id. at 215.  Adams Golf thus does not carry the weight the

University claims it does.[7]

_____

[7] Adams Golf is also distinguishable from this case in
that in that case the defendant bore the burden of proving the
asserted defense, loss causation.  The plaintiffs had brought an
action alleging materially false or misleading statements in
violation of Sections 11 and 12(a)(2) of the Securities Act of
1933.  Those Sections do not require a plaintiff to prove loss
causation in order to state a claim, but a defendant may argue
as an affirmative defense that any misstatements did not cause a
loss.  See Adams Golf, 381 F.3d at 277.  Our Court of Appeals
found that the district court had improperly granted the
defendant's motion to dismiss based on this affirmative defense
because "[u]nder sections 11 and 12(a)(2), plaintiffs do not
bear the burden of proving causation."  Adams Golf, 381 F.3d at
277.
        A Noerr-Pennington defense differs from the negative
causation defense at issue in Adams Golf in that under Noerr-
Pennington the plaintiff bears the burden of proving that the
petitioning activity is a sham undeserving of Noerr-Pennington
protection.  As the Supreme Court explained in PRE, because
"[t]he existence of probable cause to institute legal
proceedings precludes a finding that an antitrust defendant has
engaged in sham litigation", proving that litigation is a sham
"requires the plaintiff to prove that the defendant lacked
probable cause to institute an unsuccessful civil lawsuit and
that the defendant pressed the action for an improper, malicious
purpose", PRE, 508 U.S. at 62.  See also In re Flonase Antitrust
Litig., 795 F. Supp. 2d 300, 311 (E.D. Pa. 2011) ("under PRE,

Instead, as the Supreme Court stressed in the language from <u>Jones v. Bock</u> quoted above, the question of whether an affirmative defense may form the basis for dismissal under Rule 12(b)(6) is one of whether a court can determine, taking all allegations as true, that the plaintiff is not entitled to relief as a matter of law.  This question brings us to the University's second argument -- that <u>Noerr-Pennington</u> applicability is a question of fact that cannot be decided at this stage.

In deciding a motion to dismiss, we "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  <u>Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel</u>, 570 F.3d 520, 523 (3d Cir. 2009).  We may grant a motion to dismiss under Rule 12(b)(6) if a complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

---

the burden falls on the party invoking the sham exception, here the Plaintiffs, to show that the conduct at issue constitutes a sham").

To be sure, the question of whether litigation is a sham can be a fact question for the jury, see In re Flonase, 795 F. Supp. 2d at 311.  But as the Supreme Court explained in PRE, when "there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause [and thus Noerr-Pennington applicability] as a matter of law,"[8] PRE, 508 U.S. at 63.  District courts in other circuits have recognized this and granted motions to dismiss on Noerr-Pennington grounds.  See, e.g., Pennwalt Corp. v. Zenith Labs., Inc., 472 F. Supp. 413, 424 (E.D. Mich. 1979); Nursing Registry, Inc. v. Eastern North Carolina Regional Emergency Medical Services Consortium, Inc., 959 F. Supp. 298, 305 (E.D.N.C. 1997).

Here, all facts relevant to the determination of Noerr-Pennington applicability are undisputed and contained within the record we may consider in deciding this motion to dismiss.  As our Court of Appeals explained in Pryor v. National Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d. Cir. 2002), in deciding a motion to dismiss under Rule 12(b)(6) we may consider

---

[8] Cheminor confirms that courts may in some cases make Noerr-Pennington determinations as a matter of law.  There, our Court of Appeals affirmed the grant of summary judgment with regard to state tort claims on the basis that such claims were barred by Noerr-Pennington.  See Cheminor, 168 F.3d at 128-29.

"documents which are <u>attached</u> to or submitted with the
complaint, as well as legal arguments presented in memorandums
or briefs and arguments of counsel.  Further, documents whose
contents are alleged in the complaint and whose authenticity no
party questions . . . may be considered." <u>Id.</u> (emphasis in
original) (citation omitted).  We may also consider matters of
public record.  <u>See</u> <u>Pension Benefit Guar. Corp. v. White Consol.</u>
<u>Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).

What gave rise to the claim of tortious interference -
- the suit that St. Jude filed in the Western District of
Tennessee -- is contained within the record of that earlier
suit, which we have now consolidated with this action.
Moreover, identical copies of the contracts giving rise to that
first suit -- the 2003 and 2007 MTAs -- are attached to the
University's complaint and to St. Jude's motion to dismiss, and
neither party disputes the authenticity of these documents.

The only factual issue that the parties seem to
dispute regarding the claim is St. Jude's intent in filing the
motion, but, as we will soon discuss, the question of intent
would only be relevant if we were to find that the action itself
was a sham, which we do not.  Thus, we find that we may consider
the application of <u>Noerr-Pennington</u> at this stage.

22

### 3.   Noerr-Pennington's
###       Application To Pennsylvania Tort Claims

Finally, we turn to the University's argument that courts have never applied Noerr-Pennington to Pennsylvania state law tort claims in an action that does not also involve state or federal antitrust claims.  Univ. Resp. at 20-21.  As we explained above, we will decide the University's tort claim according to Pennsylvania state law.

The University argues that in Cheminor, the "Third Circuit applied the doctrine to New Jersey state law claims in conjunction with its application of the doctrine to federal and state antitrust claims."  Id. at 20.  It contends that Cheminor is thus distinguishable from the instant case where "there are no state or [federal] antitrust claims" and "the activity that underlies the University's common law tort claim is outside of the antitrust context."  Id. at 21.  The University argues that Cheminor relied on a "prediction that the New Jersey Supreme Court would so apply the doctrine to tort claims under New Jersey law", and "no court has made a similar prediction as to what the Pennsylvania Supreme Court would do".  Id.

St. Jude counters that the University "offers no basis for determining that a Pennsylvania court would reach any

conclusion different from the New Jersey courts on this question."  St. Jude Reply at 5.

The distinction between Pennsylvania law here and New Jersey law in Cheminor is unconvincing.  First, the Third Circuit in Cheminor did not rely on existing New Jersey state law in reaching its conclusion.  Instead, it found that "New Jersey has not yet decided whether the Noerr-Pennington doctrine 'extends beyond antitrust law to tort liability'", but found "no persuasive reason why these state tort claims, based on the same petitioning activity as the federal claims, would not be barred by the Noerr-Pennington doctrine."  Cheminor, 168 F.3d at 128. Although here the state tort claim does not accompany antitrust claims, Pennsylvania courts have recognized that Noerr-Pennington immunity extends beyond the anti-trust context.  See, e.g., Wawa, Inc. v. Alexander J. Litwornia & Assoc., 817 A.2d 543, 546 (Pa. Super. 2003); DeSimone, Inc. v. Philadelphia Authority for Indus. Dev., No. 002707, 2003 WL 21390632, at *5 n.7 (Pa. Com. Pl. June 10, 2003).

The limited Pennsylvania jurisprudence regarding Noerr-Pennington suggests that the Pennsylvania courts hew closely to the Third Circuit's interpretation of the doctrine. In Wawa, Inc. v. Alexander J. Litwornia & Assoc., 817 A.2d 543 (Pa. Super. 2003), for example, the Superior Court adopted the

reasoning of the Third Circuit governing Noerr-Pennington on several grounds.  See id. at 547-48 (quoting Barnes Foundation v. Twp. of Lower Merion, 242 F.3d 151 (3d Cir. 2001), for the impact of Noerr-Pennington on suits brought to stifle First Amendment activity and citing Cheminor for the principle that a material misrepresentation affecting the core of a litigant's case may preclude Noerr-Pennington immunity).  See also, e.g., Sudarkasa v. Glanton, 57 Pa. D. & C. 4th 472, 500-01 (Pa. Com. Pl. 2002) (relying on Barnes Foundation).

Importantly, the Pennsylvania courts have followed our Court of Appeals in applying Noerr-Pennington in Pennsylvania tort cases outside the antitrust context.  In Brownsville Golden Age Nursing Home v. Wells, 839 F.2d 155 (3d Cir. 1988), for example, our Court of Appeals upheld the dismissal of the plaintiff's tort law claims of malicious abuse of process and tortious interference with contractual relationships, finding that Noerr-Pennington barred liability for "damage caused by inducing legislative, administrative, or judicial action", id. at 160.

In Sudarkasa, the Philadelphia Court of Common Pleas upheld a trial court's nonsuit verdict on the reasoning that Noerr-Pennington barred the plaintiff's tortious interference with contract claim.  Id. at 498-501.  In doing so, the Court

25

relied on the principle articulated in <u>Brownsville Golden Age</u> <u>Nursing Home</u> that "actions giving rise to the interference with contractual relations are not improper where they 'foster a social interest of greater public import than is the social interest invaded'" and "[o]f great social interest is the exercise of the First Amendment right to petition the government."  <u>Sudarkasa</u>, 57 Pa. D. § C. 4th at 500 (quoting <u>Brownsville</u>, 839 F.2d at 159).

We predict that the Pennsylvania courts would likely find <u>Noerr-Pennington</u> applicable to the University's tort claim here, and St. Jude will be immune from suit based on its claim originally made in the Western District of Tennessee unless that litigation is a sham.

### c.   **Whether St. Jude's Litigation Was A "Sham"**

The Supreme Court outlined a two-part definition of "sham" activity in <u>PRE</u>, explaining that the inquiry is initially -- and often finally -- an objective one.  In order for a suit to be a "sham," it "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under <u>Noerr</u>", <u>PRE</u>, 508 U.S. at 60.  <u>See also</u>

Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 381
(1991) (whether an activity is a sham is determined by objective
criteria).  Only if the suit is objectively without merit can a
court consider a litigant's subjective motivation: "Under this
second part of our definition of sham, the court should focus on
whether the baseless lawsuit conceals an attempt to interfere
directly with the business relationships of a competitor,
through the use [of] the governmental process -- as opposed to
the outcome of that process . . . .", PRE, 508 U.S. at 60-61
(emphasis in original) (internal citations and quotations
omitted).

        A suit is objectively baseless if the litigant did not
have probable cause to institute legal proceedings.  See id. at
62 ("[t]he existence of probable cause to institute legal
proceedings precludes a finding that an antitrust defendant has
engaged in sham litigation").  Probable cause "requires no more
than a reasonable belief that there is a chance that a claim may
be held valid upon adjudication".  Id. at 62-63 (internal
citations, quotations and alterations omitted).

        Under PRE, the party alleging that the litigation is
not protected by Noerr-Pennington bears the burden of
demonstrating that the challenged conduct was a sham, and "[i]f
an objective litigant could conclude that the suit is reasonably

calculated to elicit a favorable outcome, the suit is immunized under Noerr, and a[] claim premised on the sham exception must fail." Id. at 60.

As we described at length above, the action giving rise to the University's tort claim was the breach of contract claim St. Jude originally filed in the Western District of Tennessee seeking eight forms of preliminary and permanent injunctive relief as well as actual, compensatory, and punitive damages and the imposition of a constructive trust or lien on the Materials and their derivatives. See St. Jude Comp., MTD Ex. A-1.

St. Jude points out that the 2003 and 2007 MTAs apply to "any progeny, portions, [and] unmodified derivatives" of the Campana Construct, 2003 MTA, Am. Comp. Ex. D at ¶ 1, and the 2007 MTA requires that the University confer with St. Jude to determine St. Jude's ownership interests before filing a patent application or commercializing any "product which contains a portion of the Materials, is derived from the Materials, or which could not have been produced but for the use of the Materials." 2007 MTA, Am. Comp. Ex. E at ¶ 5. St. Jude thus argues that in order to meet its burden of showing that the Tennessee litigation was a sham, the University would have to allege facts that, if proven, would show that no reasonable

28

litigant could have believed that any portion of Dr. June's research included progeny, portions, or unmodified derivatives of the Campana Construct or contained, incorporated, used, included a portion of, was derived from, or could not have been produced but for the use of the Campana Construct.  MTD at 18-19.

St. Jude contends that instead of alleging facts to support these claims, the amended complaint suggests that the Campana Construct was used in developing the Penn Immunotherapy. St. Jude points to paragraph twelve of the amended complaint where the University avers that "Dr. June asked Dr. Campana for a sample of the Campana Construct that his laboratory could modify to create a lentiviral vector for pre-clinical, non-human testing for cancer", Am. Comp. ¶ 12.  It also points to paragraph fifteen where the University explains that Dr. June's research involved "modification of excised segments of the Campana Construct and development of the Penn Immunotherapy." Id. ¶ 15.  St. Jude also notes that in its November 22, 2011 letter seeking to terminate the MTA, the University wrote that "Dr. June's construct has been significantly modified from that provided by Dr. Campana and is currently in use in clinical trials."  Id. Ex. F at 2.

St. Jude argues that in light of these contentions, and although the University may argue with regard to the breach of contract and declaratory relief claims either that it did not publish or seek to commercialize the Campana Construct, or that its use of the Construct was not encompassed in the MTAs, "it is preposterous to contend that it is 'objectively unreasonable' for St. Jude to have alleged in the [Tennessee action] that the MTAs' references to 'progeny' and 'portions' of the Materials, constructs 'derived from' the Materials, and 'use' of the Materials, bring these modifications within the Agreements' scope."  MTD at 20.

We agree.  Rather tellingly, Count II of the University's amended complaint on its face bolsters St. Jude's position that there was ambiguity about the role of the Campana Construct in the research on which Dr. June published and the products the University sought to commercialize.  Such ambiguity gives rise to a "reasonable belief that there is a chance that a claim may be held valid upon adjudication", PRE, 508 U.S. at 62-63.

In this Count, the University seeks a declaratory judgment that it "has not materially breached the 2003 MTA", that "the 2003 MTA has been terminated", and that "the University has not materially breached the 2007 MTA."  Am. Comp.

30

¶ 75 (b)-(d).  In support of its claim the University maintains
that "[t]here is a real and actual controversy between the
parties as to whether the University has materially breached the
Agreements as alleged in the Tennessee Complaint."  Id. ¶ 71.
St. Jude's complaint, which alleges a material breach of the
MTAs, see St. Jude Comp. ¶¶ 69-72, 82-84, confirms this
position.  Indeed, St. Jude's breach of contract claim and the
University's prayer for declaratory judgment perform cognate
functions of determining the parties' rights under their
contracts.  See, e.g., Note, Developments in the Law:
Declaratory Judgments, 1941-1949, 62 Harv. L. Rev. 787, 805-17
(1949) ("The declaratory judgment comprises an authoritative
judicial statement of the jural relationships between parties to
a controversy" and a prayer for declaratory relief is
justiciable if "a coercive cause of action has already accrued
to one of the parties with respect to that issue, or if it is
relatively certain that coercive litigation will eventually
ensue between the same parties if a declaration is refused"); E.
Borchard, Declaratory Judgments 279 (the "broad objective" of
declaratory judgments is "to settle and afford relief from
uncertainty and insecurity") (2d ed. 1941) (internal quotations
omitted).  By bringing a declaratory judgment action, the
University implicitly but necessarily acknowledges an ambiguity

as to contractual rights that makes reasonable St. Jude's belief that its claims would be held valid upon adjudication.

In contending that the litigation does not deserve Noerr-Pennington protection, the University does not specifically argue that the Tennessee litigation was a sham, but it does say that "St. Jude made a baseless and unfounded demand for preliminary injunctive relief in the Tennessee Action that is unwarranted by the MTAs at issue, and it made this demand with the specific purpose of interfering with the Univer[s]ity's business relations."  Univ. Reply at 22.

As an example of the putative baselessness of the relief sought, the University notes that St. Jude requested a preliminary injunction ordering the University not to enter into any agreement to commercialize the Materials without St. Jude's permission despite St. Jude's concession that the damage it would suffer from unpermitted contracts was a deprivation of income.  Id. at 22 n.4.  Pointing to the well-established principle that an injunction is inappropriate where the potential injury is monetary loss, see, e.g., ECRI v. McGraw-Hill, Inc., 809 F.2dd 223, 226 (3d Cir. 1987), the University argues that "[t]his admission in and of itself demonstrates that the demand for relief was objectively meritless and unfounded." Univ. Reply at 22 n.4.

St. Jude persuasively responds that whether that prayer for injunctive relief lacks merit "is beside the point" because "[c]ourts have routinely held that as long as some of the claims in a complaint have a proper basis, the lawsuit is not a sham for Noerr-Pennington purposes."  St. Jude Reply at 5 n.5.  St. Jude points to Dentsply Int'l, Inc. v. New Tech. Co., No. 96-272 MMS, 1996 WL 756766 (D. Del. 1996), where Judge Schwartz held that "litigation will not be considered a 'sham' so long as at least one claim in the lawsuit has objective merit."  Id. at *2.  Dentsply relied on the language in PRE that in order to be a sham, the "lawsuit must be objectively baseless," PRE, 508 U.S. at 60, and it cited Eden Hannon & Co. v. Sumitomo Trust & Banking Co., 914 F.2d 556 (4th Cir. 1990), where the Fourth Circuit found that a suit where the plaintiff succeeded on one of four claims was "hardly a sham."  Id. at 565.  Dentsply's reasoning is convincing, particularly since we are mindful of the "very narrow scope" of the sham exception. VIM, Inc. v. Somerset Hotel Ass'n, 19 F. Supp. 2d 422, 426 (W.D. Pa. 1998).  We will not find that the Tennessee litigation -- which sought to determine the very rights that the University seeks to be decided here -- was a sham.

Finally, the University's allegations suggest that the timing of St. Jude's litigation in the Western District of

33

Tennessee reveals a bad ulterior motive: "St. Jude improperly sought an injunction for which it had no basis and timed the Tennessee Action to disrupt the University's collaboration with Novartis." Univ. Resp. at 25. Because we have found that the Tennessee litigation was not a sham, we need not consider St. Jude's motive in filing that now-consolidated suit. See, e.g., PRE, 508 U.S. at 60 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.").

**III. <u>Conclusion</u>**

For the foregoing reasons, we will grant St. Jude's motion to dismiss Count I of the University's complaint and its motion to dismiss Count I of the University's counterclaim.

BY THE COURT:

<u>/S/ STEWART DALZELL, J.</u>

34